STATE OF NORTH CAROLINA v. ERNEST MACK

No. 62

(Filed 13 December 1972)

1. Criminal Law § 99— conferences at bench — neutrality of court
   Conferences between the judge and the solicitor at the bench during the course of defendant's trial for first degree murder did not compromise the court's neutrality to defendant's prejudice.

2. Criminal Law § 89— prior inconsistent statements — impeachment without laying foundation
   Where prior inconsistent statements of a witness are offered into evidence for purposes of impeachment, a foundation need not be laid before the inconsistency may be shown where the statement relates to a matter pertinent and material to the pending inquiry.

State v. Mack

3. Criminal Law § 89— indirect inconsistency — impeachment without laying foundation

A defense witness's in-court testimony that she had heard deceased threaten defendant was indirectly inconsistent with her earlier failure to so state at the time she told a police officer that she had heard defendant threaten deceased; the police officer could properly testify to this inconsistency without the laying of a foundation since it related to defendant's plea of self-defense, a matter pertinent and material to the pending inquiry.

4. Criminal Law § 86— impeachment of defendant — prior misconduct

The trial court did not err in allowing the solicitor to ask defendant on cross-examination questions with respect to fourteen previous occasions of misconduct by defendant.

5. Criminal Law § 86— impeachment of defendant — prior arrest or indictment

Although a defendant may not be asked if he has been accused, arrested or indicted for a particular crime, specific acts of criminal and degrading conduct may be inquired about since such questions relate to matters within the knowledge of the witness.

6. Criminal Law § 89— impeachment of State's witness — prior criminal conduct

The record does not support defendant's contention that the court refused to permit defense counsel to cross-examine a State's witness concerning prior criminal conduct for purposes of impeachment.

7. Criminal Law § 50— epileptic seizure of deceased — testimony as to observed facts not opinion evidence

Admission of testimony by a witness that she observed deceased having an epileptic seizure did not constitute prejudicial error since the question of whether deceased was having a seizure was wholly immaterial to the inquiry.

8. Criminal Law § 50— bullets fired at close range — opinion of medical examiner — personal observations

Where the county medical examiner was not offered as an expert witness in the field of ballistics, his opinion testimony that bullets entering deceased's ear were fired at close range was nevertheless competent since it was based on his personal observations; moreover, even if the statement were technically incompetent, its admission resulted in no prejudice to defendant because its exclusion would not likely have produced a different result.

9. Criminal Law § 21; Indictment and Warrant § 14— first degree murder indictment — trial for second degree murder — motion to quash properly denied

Defendant was not entitled to quashal of the bill of indictment returned by the grand jury charging him with first degree murder where, following a preliminary hearing, he was bound over for trial on the lesser charge of second degree murder.

**10. Criminal Law § 93— order of proof — matter within discretion of trial court**

 The admission in a criminal prosecution of evidence as a part of the rebuttal, when such evidence would have been properly admissible in chief, rests in the sound discretion of the trial judge and will not be interfered with in the absence of gross abuse of that discretion.

DEFENDANT appeals from judgment of *McLean, J.*, 29 May 1972 Schedule "C" Session, MECKLENBURG Superior Court.

Defendant was tried upon the following bill of indictment:

"THE JURORS FOR THE STATE UPON THEIR OATH DO PRESENT, That Ernest Mack late of the County of Mecklenburg on the 3 day of March 1972, with force and arms, at and in the said county, feloniously, wilfully, and of his malice aforethought, did kill and murder Nathaniel Reid contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."

Laura Springs Daniels, the State's principal witness, testified that on 3 March 1972 Nathaniel Reid was walking up Manson Street in the City of Charlotte, Ernest Mack was following him, and she was walking behind both of them; that they went from Manson Street to Church Street, and she heard Ernest Mack tell Nathaniel Reid that he was going to beat him up; that they reached a vacant lot beside a cafe on the corner of Summit and South Church Streets and walked along a little path crossing the vacant lot; that Nathaniel Reid was walking backwards facing Ernest Mack; that Ernest Mack struck Nathaniel Reid with his fists and knocked him down; that Reid arose and Mack knocked him down again and fired a shot while Reid was on the ground; that Mack then stood over Reid with a pistol in his hand while Reid was "having a fit or seizure or whatever you call it"; that after watching Reid for about five minutes, Mack picked Reid up by the hair of the head, placed the gun to the left side of Reid's head and pulled the trigger; and, as she left hurriedly for the nearby cafe to call the police, she heard a third shot. This witness further testified that she had seen Ernest Mack and Nathaniel Reid fighting many times and that they were always arguing "about this lady. . . . I don't know her name. She lives with Ernest Mack."

Robert Fulwiley, Jr., testified that on the afternoon of 3 March 1972 he saw defendant entering his house holding a pistol in his hand and heard him say "it was all over."

Dr. Hobart R. Wood testified that he examined the body of Nathaniel Reid after it had been removed to the morgue and found three gunshot wounds, two in the left ear which penetrated the brain, showing powder markings around the entry wounds. The third gunshot wound was in the neck over the Adam's apple, the bullet lodging in the back of the neck at the base of the skull. All three bullets were recovered. Dr. Wood testified over objection that in his opinion the three bullets were fired "at very close range, within matter of inches."

Arthur L. Reid testified that he saw Ernest Mack and Nathaniel Reid at Robert Fulwiley's house on the afternoon of 3 March 1972 prior to the shooting; that defendant struck Nathaniel Reid across the head with a pistol and knocked him down whereupon Reid ran around the house and defendant followed him; that defendant returned a short time later with a pistol in his hand and said it was all over.

Sergeant S. T. Stone of the Charlotte Police Department went to the scene following the shooting and found Nathaniel Reid lying facedown and apparently dead at that time. He saw Ernest Mack crossing the street a block away, overtook him and placed him under arrest.

The defendant testified as a witness in his own behalf. He said he had known Nathaniel Reid all of his life; that Reid had become "a little fresh" with defendant's wife and he decided to speak to Reid about it; that Reid denied the accusation saying, "I ain't messing with your damn wife"; that Reid continued his associations with defendant's wife and had whipped her and threatened to kill her and the defendant; that on several occasions previous to the shooting Nathaniel Reid attempted to start a fight but defendant said he didn't want any trouble; that on one occasion the deceased pulled a knife and threatened to kill defendant; that on March 2, Reid called him on the telephone and said: "The next time you see me be ready, I have heard you have got a gun and I have got one too."

Defendant further testified that on 3 March 1972 he met Nathaniel Reid on the corner of Summit and Church Streets at the vacant lot where they exchanged angry words and Reid struck him; that he then knocked Reid down and Reid put his hand in the bib of his overalls to get a gun; that he saw the handle of Reid's gun and, thinking Reid intended to kill him in view of the threats, he pulled his gun, fired three shots,

returned his gun to his pocket and went back up the street. Defendant said his gun was about four feet from Nathaniel Reid's head when he fired the three shots, "one after another."

James Daniel Rice testified that he had seen Nathaniel Reid with the defendant's wife occasionally; that he had seen her enter the back door of Reid's house and that she would stay there a day or two at the time.

Ben Teasley testified that on the morning of 3 March 1972, the day Reid was killed, he saw Reid walking up and down the street with a pistol, drinking while walking, and saying he was going to kill Ernest Mack.

Janie Crawford, a witness for defendant, testified that she had seen Nathaniel Reid with the defendant's wife; that she had spent the night at the Reid home and defendant's wife occupied the same bed with Reid; that on one occasion Mrs. Mack stayed at the Reid home for three weeks; that she had heard Nathaniel Reid threaten the life of defendant on various occasions. This witness further stated that she was married and lived at the same house where Ernest Mack was living; that she had a key to the front door.

By way of rebuttal, the State offered Mary Jane Burton, a "criminalist" with the Charlotte-Mecklenburg Crime Laboratory, who testified that she examined the gun with which Nathaniel Reid was killed and found traces of blood inside the barrel; that she examined the shoes defendant was wearing and found human blood on the tops of the shoes near the front.

W. D. Starnes, a Charlotte police officer, testified that he went to the scene of the shooting, examined the body of Nathaniel Reid there on the ground, and found no gun on him. This officer further testified that he had talked with defendant's witness Janie Crawford at defendant's residence about 7:30 p.m. on the evening of 3 March 1972 during his investigation of the crime. Over objection this witness was permitted to testify "for the purpose of contradicting Janie Crawford" that she had said Ernest Mack had threatened the life of Nathaniel Reid several times in the past few weeks but had made no statement that Nathaniel Reid had ever threatened the defendant Ernest Mack.

The jury convicted defendant of murder in the first degree and recommended life imprisonment. Judgment was pro-

nounced accordingly and defendant appealed. Errors assigned will be noted in the opinion.

*John R. Ingle, Attorney for defendant appellant.*

*Robert Morgan, Attorney General, and Thomas B. Wood, Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

[1] During the course of the trial, the presiding judge twice called the solicitor to the bench and conferred with him, following which the solicitor resumed his examination of the witness then on the stand. Defendant contends these conferences were highly suggestive to the jury and compromised the court's neutrality to the prejudice of the defendant. This constitutes defendant's first assignment of error.

What was said between the judge and solicitor is not shown by the record. Whispered conferences at the bench between the judge and the solicitor, or the judge and defense counsel, or both, are common occurrences and are often necessary to facilitate the trial and avoid delays incident to excusing the jury. Sinister motives and prejudicial consequences may not be inferentially attributed to such occurrences with nothing in the record to support the inference. This assignment is overruled without further discussion.

Janie Crawford, a defense witness, testified that she had heard the deceased threaten the life of defendant. There was no cross-examination concerning other threats, if any, she might have heard. In rebuttal, over objection and after a proper limiting instruction, Officer Starnes was permitted to testify that during his investigation he had talked with Janie Crawford shortly after the murder; that she had told him the *defendant* had threatened deceased quite often in the past few weeks but had said nothing whatsoever about the *deceased* having threatened the defendant. The admission of this testimony by Officer Starnes for the limited purpose of contradicting and impeaching the testimony of Janie Crawford constitutes defendant's second assignment of error.

[2] Prior statements of a witness which are inconsistent with his present testimony are not admissible as substantive evidence because of their hearsay nature. *Hubbard v. R. R.*, 203 N.C. 675, 166 S.E. 802 (1932); *State v. Neville*, 51 N.C. 423

(1859). Even so, such prior inconsistent statements are admissible for the purpose of impeachment. *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971); *State v. Britt,* 225 N.C. 364, 34 S.E. 2d 408 (1945); Stansbury, N. C. Evidence, § 46 (2d ed. 1963). Whether a foundation must be laid before a prior inconsistent statement may be shown depends on whether the prior inconsistency relates to *a matter pertinent and material to the pending inquiry,* or is merely *collateral.* If the former, the statement may be shown by other witnesses without the necessity of first laying a foundation therefor by cross-examination. *State v. Wellmon,* 222 N.C. 215, 22 S.E. 2d 437 (1942); *State v. Carden,* 209 N.C. 404, 183 S.E. 898 (1936); *Jones v. Jones,* 80 N.C. 246 (1879); *State v. Patterson,* 24 N.C. 346 (1842); Stansbury, N. C. Evidence, § 48 (2d ed. 1963). Accordingly, if Janie Crawford's prior statement to Officer Starnes that defendant had threatened the deceased when coupled with her *failure* also to state that the deceased had threatened defendant was inconsistent with her in-court testimony and concerned matters pertinent and material to the inquiry, then that prior statement was properly admitted for impeachment purposes and laying a foundation therefor by cross-examination was unnecessary.

[3] Applying the foregoing principles, we hold that Janie Crawford's in-court testimony that she had heard deceased threaten defendant was inconsistent with her earlier *failure* to so state at the time she told Officer Starnes she had heard defendant threaten deceased. " . . . [I]f the former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent," McCormick, Evidence, § 34 (2d ed. 1972), and is termed an *indirect inconsistency. Esderts v. Chicago Rock Island & Pacific Co.,* 76 Ill. App. 2d 210, 222 N.E. 2d 117 (1966). *See also Erickson v. Erickson & Co.,* 212 Minn. 119, 2 N.W. 2d 824 (1942). Surely Janie Crawford, a friend of defendant who lived in his home, when being questioned by officers about the relationship between defendant and deceased would naturally have related threats made by deceased against defendant as well as threats made by defendant against deceased. Therefore, her failure to tell Officer Starnes of such threats by deceased when it was natural to do so is indirectly inconsistent with her in-court testimony concerning such threats. Hence, evidence of such failure was admissible to impeach her testimony to that effect.

---

---

In the context of this record, this evidence was admissible without laying a foundation by cross-examination of Janie Crawford. Defendant, relying on his plea of self-defense, had testified that deceased had frequently threatened his life and had warned him to "be ready." Janie Crawford later testified that she too had heard deceased threaten defendant. Such threats, although apparently not communicated to defendant, were competent to corroborate defendant's testimony. *State v. Baldwin,* 155 N.C. 494, 71 S.E. 212 (1911); *State v. Turpin,* 77 N.C. 473 (1877). Therefore, when Janie Crawford failed to relate to Officer Starnes that she had heard deceased threaten defendant, she failed to relate a fact pertinent and material to the case under circumstances in which it would have been natural to do so. Under the rule enunciated, this failure may be shown without laying a foundation. *Compare State v. Taylor,* 250 N.C. 363, 108 S.E. 2d 629 (1959). The evidence of Officer Starnes was properly admitted, and defendant's second assignment of error is overruled.

[4] The State was permitted over defendant's objection to ask him on cross-examination a series of questions concerning his prior criminal conduct. Rather than asking defendant what he had been convicted of, the solicitor phrased these questions as follows: "Directing your attention back to the year 1950, did you assault someone with a deadly weapon which resulted in serious injury?" Similar questions were propounded with respect to fourteen different offenses between 1950 and 1970. Defendant stated that he had committed five of the offenses, including sodomy, crime against nature and assault with a deadly weapon inflicting serious injury, but he denied having committed the other nine offenses. Defendant contends that cross-examination for impeachment purposes concerning criminal conduct is limited to inquiry about prior *convictions* and assigns the allowance of these questions as error.

It has long been the rule that where a defendant in a criminal case testifies in his own behalf, specific acts of misconduct may be brought out on cross-examination to impeach his testimony. *State v. Colson,* 194 N.C. 206, 139 S.E. 230 (1927); Stansbury, N. C. Evidence § 111 (2d ed. 1963). Such "cross-examination for the purpose of impeachment *is not limited to conviction of crimes.* Any act of the witness which tends to impeach his character may be inquired about or proven by cross-examination." *State v. Sims,* 213 N.C. 590, 197 S.E. 176 (1938).

[5] Although a defendant may not be asked if he has been accused, arrested or indicted for a particular crime, *State v. Williams,* 279 N.C. 663, 185 S.E. 2d 174 (1971), he may be asked if he in fact committed the crime. "It is permissible, for purposes of impeachment, to cross-examine a witness, including the defendant in a criminal case, by asking disparaging questions concerning collateral matters relating to his criminal and degrading conduct. [Citations omitted.] Such questions relate to matters *within the knowledge of the witness,* not to accusations of any kind made by others." *State v. Williams, supra. See also State v. Griffin,* 201 N.C. 541, 160 S.E. 826 (1921); *State v. Colson, supra.* Of course, such questions must be asked in good faith, *State v. Williams, supra; State v. Bell,* 249 N.C. 379, 106 S.E. 2d 495 (1959). When this assignment is subjected to these rules, its lack of merit is quite apparent.

[6] Defendant's fourth assignment of error is based on the contention that the trial court did not allow him to impeach a State's witness on cross-examination by questions concerning her prior criminal conduct.

The record pertinent to this assignment reveals the following exchange among the court, defense counsel and the witness:

"Q. [by Mr. Ingle, defense counsel] In April of 1971 you were tried—

COURT: Wait just a minute. Members of the jury, you step out to your room a minute, please.

(JURY RETIRES TO JURY ROOM.)

COURT: What are you going by?

MR. INGLE: Your Honor, I am going by records I got down in the police department.

COURT: . . . Now, what did you say about your conviction?

A. [by witness] Well, this is the way it was. My husband was caught stealing and I was with him. I had not done anything, the officer said, but I was—Judge Gatling placed me on probation. He gave me six months suspended under two years probation. I got arrested again for damage to real property. I was on probation and my probation officer had it over on me and she revoked by probation and I was tried before you.

State v. Mack

COURT: Did you appeal to this court?

A. Yes, I appealed.

COURT: What happened when you got up here?

A. They declared a mistrial, took me off probation.

COURT: Tell the clerk. He will have to get the file. What else do you want to ask her about?

MR. INGLE: I wanted to ask her about occupying a room for immoral purposes.

A. Yes, I wasn't tried for it. It was throwed out of court. Mistrial. I didn't say anything. They told me to go home. It was a mistrial.

MR. INGLE: I was going to ask you about breaching the peace on April of this year.

A. Yes, I was at home.

COURT: Were you tried and convicted of it? This is the important part.

A. I pleaded guilty.

COURT: For disorderly conduct?

A. Yes.

Q. [by Mr. Ingle] What else have you been tried and convicted of?

A. That is it.

COURT: Well, you will have to get the file on this other now. Anything else you want to ask her?

MR. INGLE: About criminal matters, no, sir.

*        *        *

COURT: After we look into this other matter I will let you recall her and ask her about something else. You may stand aside.

MR. RANKIN [solicitor]: I would like to ask a few more questions on redirect.

COURT: Let the jury come back."

The jury returned and, following Mr. Rankin's redirect examination, defense counsel further cross-examined the witness at length but failed to propound any question concerning her prior criminal conduct. This suggests that he either overlooked the matter or was satisfied with what he had already brought out before the jury. In any event, the record does not support the contention that the court refused to permit counsel to cross-examine the witness concerning prior criminal conduct for purposes of impeachment. Defendant's fourth assignment of error is overruled.

Defendant's fifth assignment of error, addressed to the refusal of the court to record the solicitor's argument to the jury, is overruled without discussion on authority of *State v. Sparrow*, 276 N.C. 499, 173 S.E. 2d 897 (1970).

[7, 8] Defendant next contends that lay witnesses were permitted to testify concerning matters calling for an expert. He argues it was error (1) to permit Laura Springs Daniels to state: "Nathaniel Reid was having a fit or seizure or whatever you call it," and (2) to permit Dr. Hobart R. Wood, the medical examiner for Mecklenburg County, to state that in his opinion the bullets entering Nathaniel Reid's ear "were fired at very close range, within matter of inches." The record does not reveal that the medical examiner was offered as an expert witness in the field of ballistics. It does show that Laura Springs Daniels knew the deceased was an epileptic and had often observed him undergoing a seizure.

Even if erroneously admitted, which is not conceded, the first statement was harmless and its admission in no sense could constitute prejudicial error. Whether the deceased was having a seizure is wholly immaterial to the inquiry. In regard to Dr. Wood's statement, the witness Daniels had already testified without objection that she saw defendant place the gun to the left side of Nathaniel Reid's head and pull the trigger. Dr. Wood had already testified without objection that the two gunshot wounds entering Reid's head at the left ear "showed powder markings, distinct zone of powder marking around the entry wound." In light of these personal observations by Dr. Wood, a man who had done an estimated three thousand autopsies according to his testimony, it would not require a ballistics expert to conclude that the gun was in close proximity to the victim's head when the bullets were fired. Dr. Wood's statement, based on his personal observations, was competent

and its admission was not error. Moreover, even if his statement be regarded as technically incompetent, its admission resulted in no prejudice to defendant because its exclusion would not likely have produced a different result. *State v. Bailey,* 280 N.C. 264, 185 S.E. 2d 683 (1972) ; *State v. Barbour,* 278 N.C. 449, 180 S.E. 2d 115 (1971) ; *State v. Barrow,* 276 N.C. 381, 172 S.E. 2d 512 (1970) ; *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969) ; *State v. Temple,* 269 N.C. 57, 152 S.E. 2d 206 (1967) ; *State v. Norris,* 242 N.C. 47, 86 S.E. 2d 916 (1955) ; *State v. Bennett,* 237 N.C. 749, 76 S.E. 2d 42 (1953). This assignment is overruled.

**[9]** Defendant was tried on a bill of indictment returned by the grand jury charging him with murder in the first degree. He moved to quash the bill on the ground that, following a preliminary hearing, he was bound over for trial on the lesser charge of second degree murder. Denial of the motion constitutes his seventh assignment of error, but he cites no authority in support of his position.

A preliminary hearing is not an essential prerequisite to the finding of a valid bill of indictment. *State v. Hartsell,* 272 N.C. 710, 158 S.E. 2d 785 (1968) ; *State v. Hackney,* 240 N.C. 230, 81 S.E. 2d 778 (1954). "In North Carolina, a preliminary hearing is simply an inquiry into whether the accused should be discharged or whether, on the other hand, there is probable cause to submit the State's evidence to the grand jury and seek a bill of indictment to the end that the accused may be placed upon trial. . . . [A]nd a discharge of the accused is not an acquittal and does not bar a later indictment. *State v. Hargett,* 255 N.C. 412, 121 S.E. 2d 589 (1961)." *State v. Cradle,* 281 N.C. 198, 188 S.E. 2d 296 (1972). Manifestly, when a prosecuting officer is satisfied that a higher grade of offense than that returned by the committing magistrate has been committed, he may draw the bill accordingly. This assignment has no merit and is overruled.

**[10]** Finally, defendant contends that certain evidence presented by the State on rebuttal should have been offered by the State while making out its case in chief and thus was erroneously admitted as rebuttal evidence.

The order of proof is a rule of practice resting in the sound discretion of the trial court. *State v. Thomas,* 244 N.C. 212, 93 S.E. 2d 63 (1956). "The court, to attain the ends of justice, may

in its discretion allow the examination of witnesses at any stage of the trial." *State v. King,* 84 N.C. 737 (1881). It is held by the great weight of authority that "the admission in a criminal prosecution of evidence as a part of the rebuttal, when such evidence would have been properly admissible in chief, rests in the sound discretion of the trial judge and will not be interfered with in the absence of gross abuse of that discretion." 53 Am. Jur., Trial § 129. *Accord,* 88 C.J.S., Trial, § 102; *State v. Knight,* 282 N.C. 220, 192 S.E. 2d 283 (1972). This assignment is overruled.

Defendant having failed to show prejudicial error, the verdict and judgment must be upheld.

No error.